UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2006 MAR 30  A 8: 39

U.S. DISTRICT COURT
DIST. OF MASS.

| | |
|---|---|
| ATHINA INVESTMENTS LIMITED; VARKEDGE LIMITED; and WISEWOOD HOLDINGS LIMITED, Individually and Derivatively on Behalf of Nikopol Ferro-Alloy Plant; **PLAINTIFFS,** V. VICTOR PINCHUK; JERRY MARGULIS; ALEXANDER NOVACK; ALLIED STEEL SA; STEELEX SA; CONSORTIUM PRYDNIPROVYE; SCIENTIFIC PRODUCTION INVESTMENT GROUP INTERPIPE CORPORATION; BIPE CO. LIMITED; NEW TREND L.L.C.; TRAVIS INVESTMENTS LLC; UKRSOTSBANK; VICTOR VEKSELBERG; and ALEXANDER ABRAMOV; **DEFENDANTS.** | CIVIL ACTION NO. |

06 CA 10560 EFH

MAGISTRATE JUDGE _____

AMOUNT $ _____
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. _____
3/30/06

## COMPLAINT

Plaintiffs, individually and derivatively on behalf of Nikopol Ferro-Alloy Plant, based on their personal knowledge and upon information and belief, by their undersigned attorneys, bring this action and allege as follows:

### PRELIMINARY STATEMENT

1.     This is an action to vindicate the rights of good-faith investors who invested in a privatized, formerly state-owned enterprise in the former Soviet Union (Ukraine), only to have

their investments fraudulently looted and diverted to the United States and other countries by U.S. citizens and others utilizing the instrumentalities of U.S. commerce. The rights of these investors cannot fairly be vindicated anywhere other than in the United States, where the rule of law applies and where jurisdiction over all members of the conspiracy may be sustained.

2.      The basis for this action is a complex international scheme masterminded by defendants Victor Pinchuk ("Pinchuk"), Jerry Margulis ("Margulis"), and Alexander Novack ("Novack"), the latter two of whom reside in this district, to seize control of Nikopol Ferro-Alloy Plant ("Nikopol"), one of the world's largest producers of ferroalloys (an input of steel), and thereafter loot the company by diverting hundreds of millions of dollars in profits to American and other entities controlled by these defendants. Plaintiffs seek to recover from defendants, on behalf of Nikopol, the misappropriated profits plus treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c), and (d). Plaintiffs also seek to invalidate defendants' fraudulent contracts and recoup all misappropriated profits pursuant to a cause of action asserted under the laws of Ukraine.

3.      Defendants' scheme to control and loot Nikopol began in 2002, at or about the time of Pinchuk's marriage to the daughter of Leonid Kuchma, the now-former president of Ukraine whose regime was widely reported in both the local and international media to have been characterized by corruption, nepotism, and ties to organized crime. At the time of Pinchuk's marriage to then-President Kuchma's daughter, 50% plus 1 share of Nikopol's outstanding shares were owned by the Ukrainian government, and Pinchuk was given effective control over the Nikopol plant. Later, in 2003, in an auction process widely understood to be rigged, Pinchuk, as Kuchma's son-in-law, was permitted to purchase the 50% plus 1 controlling

LITDOCS/635723.1

interest in Nikopol from the Ukrainian government at a price so low that it was tantamount to theft.

4. Once in control of Nikopol, Pinchuk, Margulis, and Novack schemed to siphon hundreds of millions of dollars in profits from Nikopol through the use of self-dealing contracts through the "buy high" (Exhibit A), "sell low" (Exhibit B), and "tolling" (Exhibit C) schemes. To implement and carry out these schemes, Pinchuk, Margulis, Novack, and the other defendants engaged, and conspired to engage, in myriad predicate acts of racketeering activity, including wire fraud, and, upon information and belief, acts of bribery (in violation of the Foreign Corrupt Practices Act), money laundering, foreign travel in aid of racketeering, and illegal monetary transactions.

5. Defendants' scheme continues today and threatens to continue into the future unless it is permanently enjoined by this Court and rendered unprofitable by a judgment requiring defendants to return their ill-gotten gains to Nikopol for the benefit of all shareholders.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the action arises under the laws of the United States, 18 U.S.C. § 1964.

7. Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because defendants Margulis and Novack reside in this district, and all other defendants are subject to service of process in an action brought in this district pursuant to 18 U.S.C. § 1965 and Federal Rule of Civil Procedure 4.

8. The Court has personal jurisdiction over defendants as a result of, among other things, their use of U.S. bank accounts to wire funds as an integral and material part of their

3

scheme and conspiracy to defraud, pursuant to 18 U.S.C. § 1965. The Court's personal jurisdiction over defendants Pinchuk, Margulis, and Novack also results from the fact that those defendants have transacted business in Massachusetts, and Margulis and Novack reside in Massachusetts.

## THE PARTIES

### Plaintiffs

9. Plaintiff Athina Investments Limited ("Athina") is a company organized under the laws of Belize with its principal place of business in Cyprus. Athina has owned shares of Nikopol since March 2003. The beneficial owners of Athina include Igor Kolomoisky ("Kolomoisky"), originally from Ukraine and now an Israeli citizen.

10. Plaintiff Varkedge Limited ("Varkedge") is a company organized under the laws of Cyprus with its principal place of business in Cyprus. Varkedge has owned shares of Nikopol since October 2000. The beneficial owners of Varkedge include Kolomoisky.

11. Plaintiff Wisewood Holdings Limited ("Wisewood") is a company organized under the laws of Cyprus with its principal place of business in Cyprus. Wisewood has owned shares of Nikopol since December 2002. The beneficial owners of Wisewood include Kolomoisky.

12. Collectively, plaintiffs currently own more than 10% of the issued and outstanding shares of Nikopol. Further, there are United States citizens who have been shareholders of Nikopol since 2002.

### Defendants

13. Defendant Pinchuk is a citizen of Ukraine. He is a childhood friend of defendants Margulis (who is also his cousin) and Novack and has spent considerable time in Massachusetts,

4

even living and working with Margulis and Novack while developing and conducting business in Massachusetts.

14.    Defendant Allied Steel SA ("Allied Steel") is a company organized under the laws of Switzerland with its principal place of business in Switzerland. Allied Steel is operated and controlled by Pinchuk, Margulis, and Novack, and it is the parent company of defendant Steelex SA ("Steelex") and of related parties KLW-Wheelco ("KLW") and Sepco SA ("Sepco").

15.    Defendant Steelex is a wholly owned subsidiary of Allied Steel. Steelex is organized under the laws of Switzerland with its principal place of business in Switzerland.

16.    Defendant Margulis is a U.S. citizen and resident of Natick, Massachusetts. He served at times relevant to this action as a director of related parties Interpipe Group Ltd. – North America ("Interpipe North America") and Sepco.

17.    Defendant Novack is a U.S. citizen and resident of Boston, Massachusetts. He served at times relevant to this action as a director of defendants Allied Steel and Steelex, as a director of related parties Sepco and KLW, and as an officer and director of related party Interpipe North America.

18.    Because Margulis and Novack obtained U.S. green cards and later U.S. citizenship, they were able to travel to Western countries without a visa, unlike Pinchuk, who is not known to be a citizen of the United States or any other Western country. This fact, and their ability to speak and understand English, made Margulis and Novack invaluable members of the RICO enterprise with Pinchuk. Upon information and belief, Margulis and Novack established and operated defendant Allied Steel and its various subsidiaries, including defendant Steelex and related parties Sepco and KLW, traveling frequently from the Unites States to Switzerland and Ukraine for that purpose. Upon information and belief, Margulis and Novack also founded,

5

operated, and managed defendants New Trend L.L.C. ("New Trend") and Travis Investments LLC ("Travis").

19.    Defendant Consortium Prydniprovye ("Dnepr Consortium") is a company organized under the laws of Ukraine. Pinchuk is the beneficial owner of Dnepr Consortium, and he operates and controls its business.

20.    Defendant Scientific and Production Investment Group (SPIG) Interpipe Corporation ("Interpipe") is a company organized under the laws of Ukraine with its principal place of business in Ukraine. Pinchuk operates, controls, and is the beneficial owner of Interpipe, which, along with related companies, controls Dnepr Consortium. Through Dnepr Consortium, Pinchuk uses Interpipe to operate, manage, and control Nikopol. Upon information and belief, Margulis and Novack serve as officers and/or directors of Interpipe.

21.    Defendant Bipe Co. Limited ("Bipe") is a company organized under the laws of Ukraine with its principal place of business in Ukraine. Pinchuk is the beneficial owner of Bipe, and he operates and controls its business.

22.    Defendant New Trend is a Wyoming corporation with its principal place of business in Delaware. Upon information and belief, the company is operated and controlled by Pinchuk, Margulis, and Novack.

23.    Defendant Travis was a Wyoming corporation with its principal place of business in Wyoming. Travis was dissolved as a matter of public record in January 2004. Upon information and belief, the company was operated and controlled by Pinchuk, Margulis, and Novack.

24.    Defendant Ukrsotsbank ("Ukrsotsbank") is a bank organized under the laws of Ukraine with its principal place of business in Ukraine. Pinchuk is the beneficial owner of the

6

majority of the shares of Ukrsotsbank, and he operates and controls its business through Ferro-Trade International, a Ukrainian company. Upon information and belief, Pinchuk used tens of millions of dollars of proceeds diverted from Nikopol to purchase his controlling interest in this bank in 2004 and, further, to make a capital contribution of $60 million in return for additional shares in the bank in 2005.

25.     Defendant Victor Vekselberg ("Vekselberg") is a U.S. citizen or permanent resident who maintains a residence in New York City.

26.     Defendant Alexander Abramov ("Abramov") is a citizen of the Russian Federation.

## RELATED PARTIES

27.     Interpipe North America, formerly known as BTC-IP, Inc., was a Massachusetts corporation with its principal place of business in Massachusetts. It was dissolved as a matter of public record in September 2001. Margulis and Novack have served at various times as officers and directors of Interpipe North America and have controlled and managed it.

28.     Ferrex Corp. ("Ferrex") was a Massachusetts corporation with its principal place of business in Massachusetts. It was dissolved as a matter of public record in December 2002. Margulis was the president, secretary, treasurer, and sole director of Ferrex.

29.     Upon information and belief, during his time in Massachusetts, Pinchuk worked with Margulis and Novack to operate and control Interpipe North America and Ferrex.

30.     Sepco is a wholly owned subsidiary of Allied Steel and is organized under the laws of Switzerland. Sepco's directors include Margulis, Novack, Pinchuk, and John Benedict Scorotino, who is a citizen or permanent resident of the United States. Upon information and

belief, Margulis and Novack were installed in these positions, in part, because of their willingness to participate in the instant scheme.

31.     KLW is a wholly owned subsidiary of Allied Steel and is organized under the laws of Switzerland. KLW's directors include Novack. Upon information and belief, Novack was installed in this position, in part, because of his willingness to participate in the instant scheme.

32.     Alba Exports LLC ("Alba") is an Oregon corporation with its principal place of business in Great Britain. Pinchuk is, upon information and belief, the beneficial owner of Alba, and he operates and controls its business with the assistance of Margulis and Novack. At times relevant to this action, Alba was the indirect controlling shareholder of defendant Interpipe. Upon information and belief, Margulis and Novack founded, operated, and controlled Alba with Pinchuk.

33.     Javier Adan Rivera Fernandez ("Fernandez") is, upon information and belief, a citizen of Panama.

34.     Mario Gaytan Portillo ("Portillo") is, upon information and belief, a citizen of Panama.

35.     Vilma Alicia Morales ("Morales") is, upon information and belief, a citizen of Panama.

36.     According to Wyoming records, Panamanian companies Worldfund Inc. and Euro-Amex Exchange Inc., which share an address in Panama City, Panama, were the original members of New Trend. Fernandez, Portillo, and Morales (collectively, the "Panama Operators") are the president, treasurer and secretary, respectively, of Worldfund and Euro-Amex Exchange. The Panama Operators also served as officers and directors of a company that,

8

according to the United Nations' 2001 Supplementary Report on the Monitoring Mechanism on

Sanctions against UNITA, was an unauthorized arms-dealer connected to UNITA, the Angolan

rebel organization that was the subject of United Nations' mandated sanctions.

37.     Paul Williams ("Williams") is, upon information and belief, a citizen of Isle of

Sark. According to Wyoming records, Williams served as the manager of Travis. Williams is

considered to be among the world's leading money launderers.

38.     Given the involvement of the Panama Operators and Williams in the operations of

New Trend and Travis, respectively, and given the role of New Trend and Travis in the tolling,

"buy high," and "sell low" schemes described in paragraphs 44 through 57 below, plaintiffs

believe and allege that these companies were organized and controlled by Pinchuk, Margulis,

and Novack as mere fronts to facilitate their illegal conduct, including laundering the proceeds of

the racketeering scheme at issue.

39.     Credit Dnepr ("Credit Dnepr") is a bank organized under the laws of Ukraine.

Pinchuk is a beneficial owner of and controls Credit Dnepr.  At all relevant times, Credit Dnepr

maintained correspondent accounts with U.S. banks through which hundreds of millions of

dollars were wired in furtherance of defendants' RICO scheme.  Credit Dnepr also managed the

Ukrainian government's block of shares in Nikopol from 1999 through the 2003 "privatization,"

described in paragraphs 61 through 70 below.

## BACKGROUND

40.     Nikopol was founded in 1966 as a state-owned company in Ukraine (formerly the

Soviet Union).  The company is currently the world's second largest ferroalloy producer,

producing more than 10% of the ferroalloys in the world market.

41.     The ferroalloys at issue are produced by smelting manganese ore, silicon, and iron into a molten mass, removing slag and other materials, and cooling the mass into a hard product. The hardened product is then crushed into small pieces resembling gravel and sold for use in the manufacture of steel. Final ferroalloy products include silicomanganese (silicon, manganese, and iron), ferromanganese (iron and manganese), and ferrosilicon (iron and silicon). All of these products are critical inputs for the manufacture of steel. Nikopol produces ferroalloys for some of the world's largest steel producers, including the steel division of United States Steel Corporation.

42.     In 1994, Leonid Kuchma was elected president of Ukraine amid optimism that he would lead the country into a free market system governed by the rule of law. In the same year Nikopol became a joint stock company, whose shares were owned by the Ukrainian state. In 1997, 19.39% of Nikopol's shares were issued to the employees and management of Nikopol, as well as other individuals. These shares were traded on the open market. The balance of the shares remained under the ownership of the Ukrainian state. In 1999, an additional 30.6% of shares were issued to private entities, increasing the total issued shares in the hands of private individuals to just less than 50%.

43.     From 1999 through 2003, PrivatBank, one of Ukraine's major financial concerns, was engaged to manage approximately 23% of Nikopol shares on behalf of itself and its clients, including the plaintiffs. At all times since October 2000, one or more of the plaintiffs have owned shares in Nikopol.

## THE SCHEME TO CONTROL AND LOOT NIKOPOL

44.     Following Nikopol's semi-privatization, and through 2002, companies controlled by Pinchuk, Margulis, and/or Novack acquired approximately 23% of Nikopol's shares. They

10

also arranged for Credit Dnepr to manage the Ukrainian state's block of shares in Nikopol. During this period, various companies unrelated to Pinchuk, Margulis, and Novack supplied raw materials to Nikopol, and Nikopol sold the final product directly into the worldwide market, benefiting the plant and all of its shareholders.

45.     In 2002, however, Pinchuk, as President Kuchma's future son-in-law, was able to exercise effective control of Nikopol.  Using his family connections, Pinchuk caused Nikopol to enter into a series of self-dealing contracts clearly designed to siphon hundreds of millions of dollars of Nikopol's profits annually to entities controlled and/or beneficially owned by Pinchuk, Margulis, and/or Novack.  These contracts caused Nikopol to (a) purchase raw materials (ore) at above market prices from entities related to Pinchuk, Margulis, and Novack and sell the finished product at below market prices to entities also controlled by Pinchuk, Margulis, and Novack; and (b) enter into unnecessary, profit-skimming tolling contracts, whereby Nikopol was paid a fee for processing ore, while other companies controlled by Pinchuk, Margulis, and Novack reaped the profits associated with selling the finished product on the open market.

## The "Buy High" and "Sell Low" Schemes

46.     In or before 2002 and through 2005, defendants Steelex and Travis entered into contracts with Nikopol to provide manganese ore.  These contracts required Nikopol to pay above market prices to purchase manganese ore from Steelex and Travis – a brazen means of diverting millions of dollars of profits from Nikopol to Steelex, Travis, and the individual defendants who owned or controlled those defendants.  Pursuant to these contracts, Nikopol purchased at least 25,000 tons of ore in 2002, 760,000 tons of ore in 2003, 483,000 tons in 2004, and 645,000 tons in 2005, having a fair market value of $188 million, but for which Nikopol paid $210 million.

47.     It is estimated that Nikopol overpaid by at least $22 million as a result of these fraudulent, self-dealing contracts.

48.     Also in 2002 and in 2003 (before the 2003 influenced privatization was completed), Interpipe entered into "commission" contracts with Nikopol. Plaintiffs have information concerning two such contracts – Contract No. 423, dated November 18, 2002, and Contract No. 2152, dated July 30, 2003. Pursuant to these contracts, Nikopol was required to pay Interpipe a commission for selling Nikopol's finished product into the open market, at prices set forth in the contract and its addendum – prices that were well below market prices.

49.     Interpipe took advantage of this arrangement by selling the finished product through Contract Nos. 12/2003ST, 20/2003ST, and 29/2003ST to Steelex, which was free to keep the profits from the subsequent, market-priced sales of the finished product. The effect of these arrangements was to strip Nikopol of the profit it would have made by selling its finished product directly to buyers in the international market, including France, Germany, Italy, and Switzerland, to whom Nikopol could have charged significantly higher (i.e., market) prices than the prices for which its product was sold through Interpipe. Substantial additional funds were also diverted to Interpipe in the form of unnecessary, profit-skimming and self-dealing commissions.

50.     It is estimated that up to $41 million of profits were siphoned from Nikopol through the combination of the commission contracts between Nikopol and Interpipe and further sales contracts between Interpipe and Steelex during 2002 and 2003.

51.     These "buy high" and "sell low" schemes were a fraud on Nikopol and its other shareholders because Nikopol could have purchased manganese ore at market prices and sold the finished product at market prices, retaining all of the profits for itself and its shareholders

12

(including plaintiffs). Instead, Nikopol's profits were diverted for the use and benefit of defendants Pinchuk, Margulis, Novack, Steelex, Travis, and Interpipe.

52.     Upon information and belief, the "buy high" and "sell low" schemes were effected through the use of the U.S. wires because (a) Nikopol paid Steelex and Travis, (b) Interpipe paid Nikopol (including the payment of more than $10 million under each of Contracts Nos. 423 and 2152), and (c) Steelex paid Interpipe, in U.S. dollars wired through U.S. banks. This belief is supported by the fact that the contracts at issue required payments to be made by wire transfer. The contracts also required that payments made in U.S. dollars be wired through U.S. banks.

## The Tolling Scheme

53.     Nikopol entered into numerous other contracts with Steelex – including Contract No. 1580, dated June 3, 2003, and Contract No. 1821, dated June 24, 2003. These contracts were part of what is known in the industry as a "tolling" scheme, pursuant to which Steelex paid Nikopol a fee ($11,920,000 under Contract No. 1580 and $13,608,000 under contract No. 1821) to convert manganese ore into finished product. Under the contracts, Steelex retained title to both the ore and the finished product so that Steelex – not Nikopol (and its shareholders) – would reap all the profits from the sale of Nikopol's finished product to buyers outside Ukraine, including France, Germany, Italy, and Switzerland.

54.     The tolling scheme was commercially unreasonable and operated as a fraud on Nikopol and its other shareholders because Nikopol could simply have purchased the manganese ore itself, converted the ore into finished product, and sold the finished product at market prices, retaining all of the profits for itself and its shareholders (including plaintiffs). Instead, those

13

profits were diverted for the use and benefit of defendants Pinchuk, Margulis, Novack, and Steelex.

55.     It is estimated that more than $20 million of profits were siphoned from Nikopol through these contracts during 2003.

56.     The tolling scheme was effected through the use of the U.S. wires because, upon information and belief, Steelex paid Nikopol and later received payment for finished product in U.S. dollars wired through U.S. banks. This belief is supported by the fact that the contracts at issue require payments to be made by wire transfer. The contracts also required that payments made in U.S. dollars be wired through U.S. banks.

57.     Upon information and belief, Steelex then traded the finished product obtained through the "sell low" and tolling schemes through related companies, receiving payment in U.S. dollars through U.S. banks in order to conceal and disguise the nature, location, source, ownership, and control of the proceeds. Upon information and belief, such "layered" transactions between related companies are commonly used in Ukraine, as well as Russia and other parts of the former Soviet Union, to conceal looted profits. This was particularly the case during the Kuchma regime.

### Bribery, Kickbacks and Extortion

58.     Upon information and belief, Pinchuk, Travis, New Trend, Interpipe, and Steelex paid bribes and kickbacks to Ukrainian officials, including former President Kuchma, to carry out their "buy high," "sell low," and tolling schemes. This belief is based, in part, on the fact that the payment of bribes and kickbacks to Ukrainian officials was so common during the Kuchma regime that the country was recognized for its "official robust criminal culture" and "the near-total corruption of its official and economic life." "Bitter Orange," *New York Times*,

January 1, 2006. Indeed, the U.S. Department of State, in its 2001 Country Report on Human Rights Practices in Ukraine, described Kuchma's regime as follows: "The pervasiveness of corruption, connections between government officials and organized crime, and the political activities of organized crime figures often blurred the distinction between political and criminal acts. Politicians, politically connected businessmen, and journalists have been the victims of attacks that were sometimes fatal and possibly were politically motivated." Notably, Pavel Lazarenko, a prime minister under Kuchma, was convicted of money laundering, wire fraud, and interstate transportation of stolen property in the United States District Court for the Northern District of California in June 2004.

59.     Upon information and belief, Pinchuk also used Kuchma's influence to extort Ukrainian officials and secure their cooperation and assistance in carrying out the schemes. This belief is based on information regarding the 2003 so called "final privatization" of Nikopol described below, as well as numerous media reports.

60.     Upon information and belief, the bribes and kickbacks made by or on behalf of Pinchuk, Travis, New Trend, Interpipe, and Steelex were made by use of the U.S. wires through banks located in the United States. Upon information and belief, the proceeds gained through extortion (i.e., the looted profits of Nikopol) were transferred by use of U.S. wires to banks located in the United States.

## The 2003 So-Called "Final Privatization" of Nikopol

61.     In December 2002, two months after Pinchuk's marriage to Kuchma's daughter and despite an October 2001 decree imposing a three year moratorium on the privatization of Nikopol, the Ukrainian government announced that it was lifting this moratorium. Two months later, in February 2003, Ukraine announced the government's intended sale of 25% of its shares

15

in Nikopol. In addition, the successful bidder would have the right to purchase an additional 25% plus 1 share belonging to the Ukrainian state. It was widely reported and believed that this sudden move regarding Nikopol and other Ukrainian companies was a deliberate effort to transfer state assets to insiders and other persons friendly to President Kuchma before his term of office expired in or about December 2004.

62.     Initially, six groups sought to bid on Nikopol's state-owned shares, including Dnepr Consortium. To ensure that Dnepr Consortium would succeed, the Ukrainian government, through Kuchma's influence, imposed various sham "additional conditions" effectively limiting the ability of other persons to participate in the bidding process.

63.     To thwart the four foreign entities seeking to bid on the tendered shares, the Ukrainian State Property Fund imposed, as an "additional condition," and contrary to Ukrainian law (requiring a 75-day notice period), that the notice period for bids on Nikopol's shares be shortened to 30 days. The government also required, as an "additional condition," that bid documents be submitted seven days prior to the announced sale date, meaning that bidders would have only 23 days in which to bid. In this time, foreign bidders were required to submit audited financial statements, documents proving the financial ability of the bidder, a license to make payments in foreign currency, and various other documents in "legalized" copies. The legalization process itself required "chain authentication" of documents by a notary in the bidder's country, authentication by the local (state or provincial) government in the bidder's country, transmittal of the bid documents to the foreign ministry in the bidder's country, and, finally, receipt of those documents by the Ukrainian Embassy in the bidder's country – a process that itself was likely to take weeks, effectively precluding foreign bidders.

64.     To thwart all Ukrainian bidders other than Dnepr Consortium, Pinchuk, through the influence of Kuchma, caused the Ukrainian government to impose as an "additional condition" a requirement that bidders or their shareholders have three years of experience managing the shares of a facility manufacturing 350,000 metric tons of electro-ferroalloys annually. The only Ukrainian company which could satisfy this condition was Dnepr Consortium, which managed shares of Nikopol.

65.     Unsurprisingly, at the end of the day, Dnepr Consortium's bid for Nikopol's state-owned shares was accepted, while the government rejected the bids of all other contenders. So blatant was the bid-rigging involved in Nikopol's privatization that it became the subject of a popular joke in Ukraine at the time – i.e., that the only "additional condition" missing in the bidding requirement was that any bidder must be owned by a company whose name began with "Inter" and ended with "Pipe" (referring to Interpipe, the affiliate of Dnepr Consortium).

66.     As the successful bidder, Dnepr Consortium purchased 76 million Nikopol shares from the Ukrainian government in May 2003 for approximately $40 million. In fact, another potential bidder offered $100 million for the first 25% tranche of shares. Three months later, in August 2003, Dnepr Consortium exercised its right to purchase an additional 25% plus 1 share for $41 million, bringing the aggregate cost for a controlling share of Nikopol to $81 million – a price so low that it was considered by many in the Ukraine and throughout the industry as tantamount to robbery. When combined with the 23% stake in Nikopol owned by various other companies owned or controlled by Pinchuk, Margulis, and Novack, the newly purchased shares gave those defendants control over approximately 73% of Nikopol's issued and outstanding shares.

17

67.     On September 27, 2005, the Chicago Tribune described the influenced

privatization of Nikopol as follows: "In 2003, Viktor Pinchuk, former President Leonid

Kuchma's billionaire son-in-law, acquired the eastern Ukraine plant in a privatization widely

regarded as rigged. Though the plant was worth $1 billion, Pinchuk paid $80 million."

68.     Upon information and belief, the "additional conditions" imposed in connection

with the so-called privatization were intended to – and did – rig the bidding process to ensure

that Dnepr Consortium would be the successful bidder. Also upon information and belief, the

bid-rigging was arranged by Dnepr Consortium and Pinchuk through the payment of bribes and

kickbacks to Ukrainian government officials, including Kuchma, by use of the U.S. wires to

make payments of U.S. dollar-denominated amounts through U.S. banks. Also upon information

and belief, Kuchma, on behalf of Pinchuk, extorted (under color of official right) Ukrainian

officials to ensure that the company controlled by Pinchuk was successful in the 2003

privatization of Nikopol. Upon information and belief, the benefits of this extortion were

transferred by use of U.S. wires through U.S. banks.

69.     The basis for this belief includes the official record of the May 2005 interrogation,

by the First Deputy Head of the Operative Directorate of the Anti-Crime Department of the

Ministry of Internal Affairs of Ukraine, of Mikhail Chechetov, the former Chairman of the

Ukrainian State Property Fund, which owned Nikopol's shares on behalf of the Ukrainian state

and organized the auction of those shares. According to that record, which has been published in

the Ukrainian media, Kuchma specifically telephoned Chairman Chechetov and told him to

"meet with . . . Pinchuk regarding this issue (privatization of the object) and, if at all possible, to

grant his request" – a statement the Chairman understood as a direction to "assist Pinchuk in his

privatization of [Nikopol]." Chairman Chechetov thereafter met with Pinchuk, who proposed a

18

plan to use an auction process to transfer an initial 25% block of shares to the winning bidder with the subsequent transfer of control over another 25% + 1 share to the winner. According to Chairman Chechetov, the privatization process was expedited at the personal request of Kuchma, and Pinchuk made a number of phone calls asking about the tender documents. Chechetov also stated that, at the direction of Kuchma, Pinchuk and he met to discuss and establish the special criteria that ensured that Pinchuk's company won the bid.

70.     After the so-called privatization was complete, defendants continued their RICO scheme to loot Nikopol and to deprive the company and the plaintiff shareholders of any profit or benefit from their investment.

## The 2004 to 2005 "Sell Low" Contracts

71.     In 2005, Bipe entered into at least two so-called "commission" contracts with Nikopol – Contract No. 69-B/2005, dated April 21, 2005, and Contract No. 70-B/2005, dated April 21, 2005. These contracts permitted Bipe to sell Nikopol's finished product to Steelex at below market prices, which it did through at least the following twenty contracts: Contract Nos. 01/2005BSF, 02/2005BSF, 03/2005BSF, 04/2005BSF, 05/2005BSF, 06/2005BSF, 07/2005BSF, 08/2005BSF, 10/2005BSF, 11/2005BSF, 12/2005BSF, 13/2005BSF, 14/2005BSF, 15/2005BSF, 16/2005BSF, 17/2005BSF, 18/2005BSF, 19/2005BSF, 20/2005BSF, and 21/2005BSF.

72.     According to these contracts, it is estimated that up to $380,988.00 of profits were siphoned from Nikopol and perhaps more if the commission contracts were amended when market prices changed. However, this number was affected by an unexpected drop in the price of ferroalloys in June and July, 2005. Upon information and belief, it is expected that addenda to the contracts between Bipe and Nikopol were executed, which lowered the price that Bipe was required to pay, and, thus, increased the amount of profit which was diverted.

73.     At about the same time, Interpipe extended the period of its so-called
"commission" contracts with Nikopol, first through 2004 and later through 2005. Pursuant to
those contracts, Interpipe sold Nikopol's finished product to Steelex at below market prices
through at least the following ten contracts:  Contracts Nos. 12/2003ST, 20/2003ST, 29/2003ST,
25/2004ST, 26/2004ST, 35/2004ST, 37/2004ST, 02/2005ST, 03/2005ST, and 05/2005ST.

74.     It is estimated that up to $112 million of profits were siphoned from Nikopol
through these contracts during 2004 and 2005.

75.     Upon information and belief, Nikopol also sold other finished products to New
Trend at below market prices, and New Trend thereafter delivered the finished product to
customers outside the United States, as part of the "sell low" scheme. This belief stems, in part,
from the fact that it makes no sense for New Trend, an obscure Wyoming company operated by
the Panama Operators (who were identified by the United Nations as being involved in illegal
arms dealing), to interpose itself between Nikopol and non U.S. customers unless these trades
were part of the "sell low" scheme.

76.     Each of the transactions effectuated pursuant to the above-referenced Bipe and
Interpipe contracts (including the resales to Steelex), as well as sales to New Trend, had the
effect of diverting profits that should have accrued to Nikopol (and its shareholders) to
defendants and other companies controlled by them.

77.     This "sell low" scheme was effected through the use of the U.S. wires because,
upon information and belief, (a) Bipe and Interpipe paid Nikopol, (b) Steelex paid Bipe and
Interpipe, (c) New Trend paid Nikopol, and (d) Interpipe and Steelex received payments, in U.S.
dollars wired through U.S. banks. This belief is supported by the fact that the contracts at issue

20

require payments to be made by wire transfer. The contracts also require that payments made in U.S. dollars be wired through U.S. banks.

78.     Upon information and belief, the finished product purchased by Steelex was then traded by Steelex through related companies. Also upon information and belief, those companies paid Steelex in U.S. dollars wired through U.S. banks in order to conceal and disguise the nature, location, source, ownership, and control of the proceeds.

## The 2004 to 2005 Tolling Contracts

79.     From 2004 to 2005, Nikopol continued the tolling scheme described in paragraphs 53 through 57 above by entering into at least twelve new tolling contracts with Steelex:

a.     Contract No. 32, dated January 16, 2004, pursuant to which Steelex paid Nikopol a fee for processing services;

b.     Contract No. 179, dated January 22, 2004, pursuant to which Steelex paid Nikopol a fee for processing services;

c.     Contract No. 1686, dated April 23, 2004, pursuant to which Steelex paid Nikopol a fee for processing services;

d.     Contract Nos. 2318 and 2344, each dated June 17, 2004, pursuant to which Steelex paid Nikopol a fee for processing services;

e.     Contract No. 2614, dated July 14, 2004, pursuant to which Steelex paid Nikopol a fee for processing services;

f.     Contract No. 2628, dated July 15, 2004, pursuant to which Steelex paid Nikopol a fee for processing services;

g.     Contract No. 15, dated January 5, 2005, pursuant to which Steelex paid Nikopol a fee for processing services;

h.     Contract No. 24, dated January 6, 2005, pursuant to which Steelex paid Nikopol a fee for processing services; and

i.     Contract Nos. 510, 511, and 513, each dated February 11, 2005, pursuant to which Steelex paid Nikopol a fee for processing services.

80.     Pursuant to each of these contracts, Steelex paid Nikopol a fee to convert

manganese ore to finished product, while Steelex retained title to the ore and received title to the

finished product, thereby allowing Steelex to reap all the profits from the sale of finished product in the international market. Nikopol would have received substantially more in terms of both income and profit from the sale of the finished product had the finished product been sold directly by Nikopol in the international market. Instead, all that Nikopol received were payments for processing fees while Steelex received the profits that rightfully belonged to Nikopol and its shareholders.

81. As one example, Contract No. 1686 required Nikopol to process manganese ore provided by Steelex and to deliver the finished ferroalloys to Steelex for sale to third parties. Under the express terms of the contract, the value of the ore provided by Steelex was $143 per metric ton, and the ore processing costs were $260 per metric ton. Pursuant to the contract, Nikopol delivered 5,598.90 metric tons of finished product (i.e., ferroalloys) to Steelex on July 1, 2004. Based on the volume of ore needed to produce that volume of finished product, the ore provided by Steelex was worth $1,410,555 (5,598 metric tons at $143 per metric ton). The processing fee paid by Steelex to Nikopol was $1,654,638. The combined cost for the raw materials and for the processing needed to produce the 5,598.90 metric tons of ferroalloys was therefore $3,065,193. According to Nikopol records, however, the ferroalloys were later sold by Steelex to an end purchaser in Saudi Arabia at a reported price of $4,938,230 – a $1,873,037 differential that should have been realized by Nikopol but instead was diverted to Steelex through this scheme.

82. Similar calculations reflecting looted profits that Nikopol could have made with respect to each of the other tolling contracts set forth above include the following:

a. At least $1,520,807 in looted profits that Nikopol would have made from the sale of 3,018.4 metric tons of ferroalloys shipped by Nikopol in April 2004 under Contract No. 2628. Without the scheme, Nikopol would have paid $756,939 for the ore, but would have sold the finished product itself. Instead, under the

22

scheme, Steelex paid Nikopol $951,942 to process the ore into ferroalloys, and Steelex then sold the finished product to an end purchaser in Argentina for an export price of $3,229,688.

b.   At least $2,403,488 in looted profits that Nikopol would have made from the sale of 6,086.0 metric tons of ferroalloys shipped by Nikopol in November 2004 under Contract No. 2318. Without the scheme, Nikopol would have paid $1,549,519 for the ore, but would have sold the finished product itself. Instead, under the scheme, Steelex paid Nikopol $1,950,413 to process the ore into ferroalloys, and Steelex then sold the finished product to an end purchaser in Saudi Arabia for an export price of $5,903,420.

c.   At least $3,136,955 in looted profits that Nikopol would have made from the sale of 9,326.6 metric tons of ferroalloys shipped by Nikopol in November 2004 under Contract No. 2628. Without the scheme, Nikopol would have paid $2,338,878 for the ore, but would have sold the finished product itself. Instead, under the scheme, Steelex paid Nikopol $2,941,423 to process the ore into ferroalloys, and Steelex then sold the finished product to an end purchaser in Japan for an export price of $8,417,256.

d.   At least $4,064,746 in looted profits that Nikopol would have made from the sale of 11,307.10 metric tons of ferroalloys shipped by Nikopol in December 2004 under Contract No. 2628. Without the scheme, Nikopol would have paid $2,835,538 for the ore, but would have sold the finished product itself. Instead, under the scheme, Steelex paid Nikopol $3,524,862 to process the ore into ferroalloys, and Steelex then sold the finished product to an end purchaser in Japan for an export price of $10,425,146.

83.   It is estimated that more than $265 million in profits were siphoned from Nikopol as a result of these contracts.

84.   The tolling scheme was effected through the use of the U.S. wires because, upon information and belief, Steelex paid Nikopol and later received payment for finished product in U.S. dollars wired through U.S. banks. This belief is supported by the fact that the contracts at issue require payments to be made by wire transfer. The contracts also require that payments made in U.S. dollars be wired through U.S. banks.

## THE ORANGE REVOLUTION

85.   United by their disgust with the "near-total corruption" and "robust criminal culture" of the Kuchma regime (*see* "Bitter Orange," *New York Times*, January 1, 2006),

Ukrainian voters took to the streets in support of what has become known as the "Orange Revolution" – a revolution so named for the campaign color of its leader, opposition candidate Victor Yushchenko, who promised to put an end to corruption and to orient the country toward democracy.

86.     In a presidential election held in October 2004, Yushchenko defeated Kuchma's protégé, Viktor Yanukovich ("Yanukovich"), by a narrow margin, necessitating a runoff. On November 22, 2004, despite widespread reports of election fraud, including voter intimidation, actual assaults, and burning of ballot boxes, the Electoral Commission announced that preliminary tallies for the runoff election showed Yanukovich in the lead by three percentage points.

87.     Yushchenko's supporters poured into Kiev's Independence Square – in what is now referred to as the "Orange Revolution" – to insist that Yushchenko be declared the winner. Amidst demonstrations, led by Yushchenko and Julia Timoshenko ("Timoshenko"), who headed the major reform party, and after five days of deliberations, the Ukrainian Supreme Court declared the runoff results invalid and called for a new vote in early December 2004, and a third vote was held on December 26, 2004, resulting in victory for Yushchenko, who took office in early 2005.

## The Reform Movement Under Prime Minister Timoshenko and The Reversal of the 2003 Privatization

88.     Once elected president of Ukraine, Yushchenko appointed Timoshenko as prime minister. She promptly announced that the new government would investigate and seek to reverse the most obviously influenced and corrupt privatizations, including Nikopol's.

89.     On or about April 5, 2005, the Ukrainian General Prosecutor filed an action to reverse the 2003 privatization of Nikopol. On August 26, 2005, the Appellate Court of Ukraine

24

declared the privatization illegal because the sale did not comport with Ukrainian law governing privatization, including by the elimination of competitive bids and other violations of the law. The Appellate Court ordered the return of the illegally purchased shares, and its decision was upheld by Ukraine's highest court.

## Pinchuk's Continued Effort, With Vekselberg and Abramov, to Retain Control of Nikopol Through Bribery

90. In the immediate aftermath of the Orange Revolution, Pinchuk's position in Ukraine was substantially weakened, particularly since his father-in-law was no longer in power. As a result, Pinchuk decided to sell his interest in Nikopol to Vekselberg, a permanent U.S. resident and prominent Russian oligarch, and Abramov, another Russian oligarch, each of whom is believed to have a net worth in excess of $1 billion.

91. Upon information and belief, in an attempt to block the new government's efforts to undo Nikopol's privatization, Pinchuk, Vekselberg, and Abramov conspired to pay up to $50 million in bribes to top Ukrainian government officials, with Vekselberg and Abramov paying $25 million and Pinchuk paying another $25 million.

92. Transcripts of telephone conversations published in the Ukrainian press suggest that Abramov and Vekselberg were attempting to exercise control over Nikopol and that the $25 million payment was made as part of that effort. The payment of the $25 million by Abramov was confirmed by the statement of a representative of Evraz Group, S.A., a company controlled by Abramov, to the media. In addition, Abramov is quoted in one of the transcripts as saying, immediately after the Appellate Court's ruling unwinding Nikopol's privatization: "Then we will tell Pinchuk, 'Pinchuk, you have not fulfilled your obligations, we are not going to pay you.'" In response to this comment, the other participant in the call asked Abramov how much money he had already paid to Pinchuk. Abramov replied: "The money that is already paid – we

will try to get it back somehow. I paid twenty five million together with Veksel [i.e.,

Vekselberg]. . . ." The other participant then responded: "It's clear. But yesterday you thought

that the court award [concerning Nikopol's privatization] would be positive, and as you see it is

negative."

93.     However, after the 2003 "final privatization" was set aside, Vekselberg and

Abramov alleged that they had paid Pinchuk $25 million as a deposit purportedly to purchase

"shares" in two Ukrainian mines in which Pinchuk had a small minority interest (Ordzhonikidze

and Marganets) – an amount that was clearly too large for minority shareholdings in the mines.

This leads to the belief that the $25 million could not be returned because, in reality, it had been

paid to Ukrainian officials and this explanation was designed to cover up what had occurred.

94.     According to numerous media reports, the General Prosecutor's investigation of

the 2003 privatization of Nikopol was hampered by the mysterious disappearance of documents

and highly unusual procedural deviations. Moreover, on July 28, 2005, the media reported that

Pinchuk bribed a top Ukrainian official in order to stall Nikopol's de-privatization. On the same

day, several judges publicly stated that they were pressured to resolve the case against the

Ukrainian state's interest.

95.     On the basis of the foregoing information, as well as other information that

Abramov and Vekselberg regularly bribe Russian officials in the course of doing business in

Russia, plaintiffs allege, upon information and belief, that at least part of the $25 million

payment made by Abramov and Vekselberg was earmarked for bribing certain top Ukrainian

officials in an effort to influence the outcome of the privatization effort. With the bribery

apparently failing to deter the General Prosecutor's efforts or influence the Ukrainian court's

decisions, Abramov (and Vekselberg) began to consider (per his telephone conversation) how he might recoup the money from Pinchuk.

96.     Upon information and belief, the $25 million payment made by Abramov and Vekselberg was made by use of the U.S. wires through banks located in the United States.

**The Dismissal of Timoshenko and
Pinchuk's Continued Control Over Nikopol**

97.     Despite the General Prosecutor's efforts to reverse Nikopol's privatization, those in control of the plant still take the orders of Pinchuk. As a result, the "buy high," "sell low," and tolling schemes continue to date, causing millions of dollars of profits to be siphoned from Nikopol each month.

98.     In an effort to change Nikopol's management, Timoshenko arranged for representatives of the State Property Fund to attend a meeting of Nikopol's shareholders in August 2005 and to support the election of new management.

99.     Almost immediately after the August 2005 shareholders' meeting, President Yushchenko dismissed Timoshenko as Prime Minister. As a result, the reform movement as it relates to Nikopol has been slowed down significantly and may have been halted. Despite the passage of seven months since Nikopol's August 2005 shareholders' meeting, defendants' RICO schemes continue and Nikopol remains under Pinchuk's control.

**FUTILITY OF A DEMAND**

100.    Although it is not necessary under Ukrainian law for plaintiffs first to have demanded that the company file the claims asserted herein directly, any such demand would be futile here.

101.    The very persons to whom plaintiffs would direct any such demand are the same persons who have directed and/or permitted the wrongful and unlawful conduct at issue to

27

continue. They are also the same persons who stand to gain from the continuation of defendants' RICO scheme.

102.    Since 2002, defendant Pinchuk has controlled Nikopol. Even after the Ukrainian court reversed the 2003 privatization, Nikopol's management has remained under Pinchuk's control and continues to approve the use of fraudulent transactions to loot Nikopol.

103.    Also since 2002, plaintiffs have tried unsuccessfully to obtain information from Nikopol about its finances and operations. Wisewood made a demand for such information in October 2003, Varkedge made a demand in April 2004, and Athina made a demand in October 2005. Other minority shareholders, including A.G. Borisonnik, T. Novikov, and PrivatBank, made similar demands for information in 2004 and 2005. Although at the end of 2005 a shareholder was allowed access to a portion of the requested information, this information was limited to official governmental reporting forms that did not provide any insight into the true nature of the "buy high," "sell low," and tolling schemes. Plaintiffs were able to obtain certain information from Nikopol, upon which the allegations of this complaint are based, only during the brief time that former Prime Minister Timoshenko was in office.

104.    Plaintiffs Athina, Varkedge, and Wisewood attempted to participate in the general meetings of Nikopol's shareholders in July 2002, April 2003, and January 2004. They were excluded from those meetings.

105.    Finally, given the power and influence that Pinchuk continues to wield in Ukraine – as a member of Parliament and one of Ukraine's and the world's wealthiest individuals – and given the dismissal of former Prime Minister Timoshenko in late 2005, litigation against Pinchuk and his allies in Ukrainian courts, which are widely considered to be corrupt (including by the U.S. Department of State as reflected in its annual reports), would be fruitless.

28

## THE RICO ENTERPRISES

106. At all times relevant to this action, Nikopol was an enterprise within the meaning of 18 U.S.C. § 1961(4), was engaged in activities that affected interstate and foreign commerce, and was controlled, directly or indirectly, by defendants Pinchuk and Dnepr Consortium, later joined by Vekselberg and Abramov in 2005.

107. At all times relevant to this action, defendants Bipe, Dnepr Consortium, and Ukrsotsbank were each enterprises within the meaning of 18 U.S.C. § 1961(4), were engaged in activities that affected interstate and foreign commerce, and were controlled, directly or indirectly, by defendant Pinchuk.

108. At all times relevant to this action, defendants Allied Steel, Interpipe, New Trend, Travis, and Steelex were each enterprises within the meaning of 18 U.S.C. § 1961(4), were engaged in activities that affected interstate and foreign commerce, and, upon information and belief, were controlled, directly or indirectly, by defendants Pinchuk, Margulis, and Novack, and, in the case of Steelex, also by Allied Steel.

109. The group comprised of Nikopol, Steelex, Interpipe, New Trend, Travis, Bipe, and Dnepr Consortium, was, at times relevant to this action, an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), was engaged in activities that affected interstate and foreign commerce, and was controlled by defendants Pinchuk, Margulis, Novack, and, later, Vekselberg and Abramov.

110. Pinchuk, Margulis, and Novack were at the hub of the association-in-fact enterprise, and the other defendants were akin to layered spokes, each controlled directly or indirectly by them (and, later, by Vekselberg and Abramov), and each important in carrying out the scheme to control and loot Nikopol and then launder the profits by investing in other entities,

such as the approximately $100 million invested in Ukrsotsbank. The association-in-fact enterprise shared the common purpose of looting Nikopol's profits for the benefit of its members (and the individuals who controlled them), its members had overlapping leadership and financial ties, and its members coordinated their activities and shared information on a regular basis.

111.    Each of the enterprises described in paragraphs 106 through 110 above maintained bank accounts from which and to which dollars were wired through U.S. banks.

112.    Credit Dnepr and Ukrsotsbank were the banks of choice for defendants, where Nikopol, Interpipe, Bipe, and/or Steelex maintained accounts, and to which dollar-denominated payments were made and received through correspondent banks in the United States, including Bank of New York, Citibank, and Chase Manhattan Bank. Nikopol received funds in bank accounts at Ukrsotsbank which cleared through a bank in the United States.

113.    Given the nature of each of the enterprises alleged herein, additional detail concerning their organization, communications, and acts of wrongdoing are exclusively within the knowledge of defendants and can be known by plaintiffs only through discovery.

## COUNT I

### Against Defendants Pinchuk, Interpipe, and Dnepr Consortium
### for Violation of RICO, 18 U.S.C. § 1962(a)

114.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 113 above as though fully set forth herein.

115.    Pinchuk, Interpipe, and Dnepr Consortium are each a "person" within the meaning of 18 U.S.C. § 1961(3).

116.    Upon information and belief, Pinchuk, Interpipe, and Dnepr Consortium committed numerous acts indictable under the wire fraud statute (18 U.S.C. § 1343) in furtherance of the schemes to defraud described herein, and they acted at all times with the

30

specific intent to defraud. The wire transfers at issue, all in U.S. dollar-denominated amounts, are believed to have been made and received through correspondent banks in the United States.

117.    Upon information and belief, Pinchuk, Interpipe, and Dnepr Consortium committed acts indictable under the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-3) in furtherance of the schemes to defraud described herein.

118.    Margulis and Novack, as the agents of Pinchuk, committed acts indictable under the foreign travel statute (18 U.S.C. § 1952) from 2002 through the 2003 privatization, including, without limitation, travel between the United States and Switzerland and between the United States and Ukraine, in furtherance of the schemes to defraud described herein. Such travel was necessary, among other things, to coordinate the activities and cooperation of Nikopol employees, to obtain contracts between Nikopol and the defendant trading companies, to manage the trading companies, to open and maintain bank accounts for the trading companies, and to obtain contracts by which the trading companies sold product to third parties. The predicate acts of interstate and foreign travel in aid of racketeering were in furtherance of the following actual or attempted acts of unlawful activity: bribery in violation of the Foreign Corrupt Practices Act, wire fraud, money laundering, and illegal transactions in monetary instruments, as alleged herein.

119.    Upon information and belief, Pinchuk, Interpipe, and Dnepr Consortium committed numerous acts indictable under the anti-money laundering statute (18 U.S.C. § 1956) in furtherance of the schemes to defraud described herein. Among other things, these defendants:

> a. received proceeds of their scheme to control and loot Nikopol with the intent to promote their unlawful activities, and/or with knowledge that the transactions

were designed to conceal or disguise the nature, location, source, ownership or control of the proceeds of their unlawful activities, all in violation of 18 U.S.C. § 1956(a)(1);

b. transported, transmitted and/or transferred monetary instruments or funds to or from the United States with the intent to promote their scheme to control and loot Nikopol and/or with knowledge that said monetary instruments represented the proceeds of their unlawful activities and that such transportation, transmission or transfer was designed to conceal or disguise the nature, location, source, ownership or control of said proceeds of their unlawful activities, all in violation of 18 U.S.C. § 1956(a)(2); and

c. intentionally promoted said unlawful activities, concealed or disguised the nature, location, source, ownership or control of said proceeds, and/or conducted financial transactions involving said proceeds to avoid transaction reporting requirements under state and/or federal law, all in violation of 18 U.S.C. § 1956(a)(3).

120.    The predicate acts of money laundering were in furtherance of the wire fraud, illegal transactions in monetary instruments, and Travel Act violations.

121.    Upon information and belief, Pinchuk, Interpipe, and Dnepr Consortium committed numerous acts indictable as illegal transactions in monetary instruments (18 U.S.C. § 1957) in furtherance of the schemes to defraud described herein.

122.    Among other things, these defendants wired "criminally derived property" in excess of $10,000, in the form of the proceeds from the sale of ferroalloys pursuant to the

schemes described herein, in U.S. dollar-denominations through correspondent banks in the United States.

123.   Some or all of these proceeds were laundered in order to conceal or disguise the nature and control of the profit diversions.

124.   The predicate acts of illegal transactions in monetary instruments were in furtherance of the wire fraud, money laundering, and Travel Act violations alleged herein.

125.   As alleged herein, Pinchuk, Interpipe, and Dnepr Consortium received income derived from a pattern of racketeering activity – including acts of wire fraud, bribery (in violation of the Foreign Corrupt Practices Act), money laundering, and illegal transactions in monetary instruments – and used that income to acquire an interest in and to operate the affairs of Nikopol in violation of 18 U.S.C. § 1962(a).

126.   These defendants' actions were related in purpose (i.e., to control and loot Nikopol for these defendants' personal benefit), and they were continuous in that they continued for many years, including at least the period from 2002 to date. Moreover, these defendants' actions have not stopped since the Orange Revolution, and they threaten to continue into the future.

127.   As a direct and proximate result of the unlawful conduct alleged in this claim, Nikopol suffered injury to its business and property in an amount to be determined at trial and believed to be in excess of hundreds of millions of dollars. Plaintiffs were injured in an amount proportionate to their percentage interests in Nikopol. Further, plaintiffs are entitled to recover their attorneys' fees and other costs incurred in the prosecution of this action.

## COUNT II

### Against All Defendants for Violation of RICO, 18 U.S.C. § 1962(c)

128.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 127 above as though fully set forth herein.

129.    Upon information and belief, all defendants committed numerous acts indictable under the wire fraud statute (18 U.S.C. § 1343) in furtherance of the schemes to defraud described herein, and they acted at all times with the specific intent to defraud. The wire transfers at issue are believed to have been made in U.S. dollar-denominated amounts, and are believed to have been made and received through correspondent banks in the United States.

130.    Upon information and belief, Pinchuk, Vekselberg, Abramov, Travis, New Trend, Interpipe, and Steelex committed acts indictable under the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-2 and/or 78dd-3) in furtherance of the schemes to defraud described herein.

131.    Upon information and belief, all defendants committed numerous acts indictable under the anti-money laundering statute (18 U.S.C. § 1956) and as illegal transactions in monetary instruments (18 U.S.C. § 1957) in furtherance of the schemes to defraud described herein.

132.    Margulis and Novack from 2002 to date, and Vekselberg from 2005 to date, committed acts indictable under the foreign travel statute (18 U.S.C. § 1952), including, without limitation, travel between the United States and Switzerland and between the United States and Ukraine, in furtherance of the schemes to defraud described herein. Such travel was necessary, among other things, to coordinate the activities and cooperation of Nikopol employees, to obtain contracts between Nikopol and the defendant trading companies, to manage the trading companies, to open and maintain bank accounts for the trading companies, and to obtain contracts by which the trading companies sold product to third parties. The predicate acts of

34

interstate and foreign travel in aid of racketeering were in furtherance of the following actual or attempted acts of unlawful activity: bribery in violation of the Foreign Corrupt Practices Act, wire fraud, money laundering, and illegal transactions in monetary instruments, as alleged herein.

133. As alleged herein, Pinchuk, Dnepr Consortium, Vekselberg, and Abramov, directly and indirectly, conducted or participated in the conduct of Nikopol's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

134. As alleged herein, Pinchuk conducted and participated in the conduct of Bipe, Dnepr Consortium, and Ukrsostbank through a pattern of racketeering

135. As alleged herein, Pinchuk, Margulis, and Novack conducted and participated in the conduct of Allied Steel, New Trend, Interpipe, and Travis through a pattern of racketeering activity.

136. As alleged herein, Pinchuk, Allied Steel, Margulis, and Novack conducted and participated in the conduct of Steelex through a pattern of racketeering activity.

137. As alleged herein, all defendants conducted or participated in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

138. As a direct and proximate result of the unlawful conduct alleged in this claim, Nikopol suffered injury to its business and property in an amount to be determined at trial and believed to be in excess of hundreds of millions of dollars. Plaintiffs were injured in an amount proportionate to their percentage interests in Nikopol. Further, plaintiffs are entitled to recover their attorneys' fees and other costs incurred in the prosecution of this action.

35

## COUNT III

### Against Defendants Pinchuk, Margulis, Novack, Interpipe Dnepr Consortium, Travis, and Steelex for Violation of RICO 18 U.S.C. § 1962(d) (Conspiracy to Violate RICO, 18 U.S.C. § 1962(a))

139.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

140.    Pinchuk, Margulis, Novack, Interpipe, Dnepr Consortium, Travis and Steelex knowingly conspired to violate RICO, 18 U.S.C. § 1962(a). These defendants committed acts in furtherance of the conspiracy, as described herein, and each was aware of the purpose of the group's conspiracy, namely, to control and loot Nikopol for the group's personal benefit.

141.    As a direct and proximate cause of the unlawful conduct alleged in this claim, Nikopol suffered injury to its businesses and property in an amount to be determined at trial and believed to be in excess of hundreds of millions of dollars, and plaintiffs were injured in an amount proportionate to the percentage interest in Nikopol. Further, plaintiffs are entitled to recover their attorneys' fees and other costs incurred in the prosecution of this action.

## COUNT IV

### Against All Defendants for Violation of RICO, 18 U.S.C. § 1962(d) (Conspiracy to Violate RICO, 18 U.S.C. § 1962(c))

142.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 141 above as though fully set forth herein.

143.    Each of the defendants knowingly conspired to violate RICO, 18 U.S.C § 1962(c). All defendants committed acts in furtherance of the conspiracy, as described herein, and each was aware of the purpose of the group's conspiracy, namely to control and loot Nikopol for the group's personal benefit.

LITDOCS/635723.1

144.   As a direct and proximate cause of the unlawful conduct alleged in this claim, Nikopol suffered injury to its businesses and property in an amount to be determined at trial and believed to be in excess of hundreds of millions of dollars, and plaintiffs were injured in an amount proportionate to the percentage interest in Nikopol. Further, plaintiffs are entitled to recover their attorneys' fees and other costs incurred in the prosecution of this action.

## COUNT V

### To Void Defendants' Tolling and Other Self-Dealing Contracts Under Applicable Ukrainian Law and for Damages Against All Defendants

145.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 144 above as though fully set forth herein.

146.   The contracts between Nikopol, on the one hand, and New Trend, Travis, Steelex, Bipe, and Interpipe (collectively, the "Contracting Defendants"), on the other hand, are invalid because they are based on improper, collusive agreements between the representatives of Nikopol and the representatives of the Contracting Defendants, who knew that the purpose of these contracts was improperly to divert the profits of Nikopol to the Contracting Defendants. As a result, the contracts are invalid under applicable Ukrainian law.

147.   Plaintiffs, individually and on behalf of Nikopol, have standing under applicable Ukrainian law to bring claims to invalidate these contracts and to recover the profits which were illegally diverted to New Trend, Travis, Steelex, Bipe, Interpipe, and any others.

148.   Under applicable Ukrainian law, the other defendants who caused Nikopol and the Contracting Defendants to enter into or continue these contracts are jointly and severally liable for the harm caused to Nikopol.

37

149.    As a direct and proximate cause of the above conspiracy, Nikopol suffered damages in an amount to be determined at trial and believed to be in excess of hundreds of millions of dollars.

## COUNT VI

### Permanent Injunctive Relief Against All Defendants

150.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 149 above as though fully set forth herein.

151.    Given the magnitude of the amount at issue in this action, the layering that has been used by defendants to conceal their actions to date, and the fact that certain of the corporations involved in the wrongful acts at issue have already been dissolved by the defendants who control them, thereby making recovery from those entities extremely difficult at best, plaintiffs seek a permanent injunction enjoining defendants from (a) continuing to divert Nikopol's profits through the use of tolling and commission contracts (including "buy high" and "sell low" contracts) and (b) bribing Ukrainian officials.

152.    Plaintiffs have no adequate remedy at law.

WHEREFORE, plaintiffs demand judgment against defendants on behalf of themselves and derivatively on behalf of Nikopol, as follows:

> a.  Preliminary and permanent injunctive relief to enjoin defendants from bribing Ukrainian government officials and from diverting the profits of Nikopol and imposing a trust on all profits which defendants improperly received.
>
> b.  An award of compensatory damages against defendants and in favor of Nikopol in an amount to be determined at trial and believed to be in excess of hundreds of millions of dollars.
>
> c.  An award of treble damages against defendants and in favor of Nikopol under RICO.

38

d. An award of costs and attorneys' fees under RICO.

e. Such other relief as is just and proper.

BINGHAM McCUTCHEN LLP

By:

Mark E. Robinson, BBO# 423080
150 Federal Street
Boston, MA 02110-1726
617-951-8000 (telephone)
617-951-8736 (telefax)
Attorney for Plaintiffs

By:

Donald K. Stern, BBO# 479420
150 Federal Street
Boston, MA 02110-1726
617-951-8000 (telephone)
617-951-8736 (telefax)
Attorney for Plaintiffs

MARKS & SOKOLOV, LLC
Bruce S. Marks
Gene Burd
Alisa Shver
1835 Market Street, 6th Floor
Philadelphia, PA 19103
215-569-8901 (telephone)
215-569-8912 (telefax)
Of Counsel for Plaintiffs

Dated: March 30, 2006